UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LAKHAN JHA and MINAKSHI KUMARI,<br><br>                Plaintiffs,<br><br>    v.<br><br>CHICAGO TITLE INSURANCE COMPANY,<br><br>                Defendant. | CASE NO. 2:23-cv-00584<br><br>ORDER |

## 1.  INTRODUCTION

This is an insurance coverage dispute. Plaintiffs Lakhan Jha and Minakshi Kumari (the "Jhas") purchased a title insurance policy from Defendant Chicago Title Insurance Company, and they made claims under the policy for several alleged title defects. Chicago Title denied all but one of their insurance claims, and this lawsuit ensued.

Before the Court are cross-motions for partial summary judgment: the Jhas move for judgment on their breach of contract, bad faith, and Insurance Fair Conduct Act (IFCA) claims; while Chicago Title moves for partial summary judgment, arguing policy exclusions preclude insurance coverage. Dkt. Nos. 20; 59.

Having considered the motions and the relevant record, as well as the argument of counsel, the Court GRANTS Chicago Title's motion for partial summary judgment and DENIES the Jhas' motion for partial summary judgment.

## 2.  BACKGROUND

### 2.1  The Jha's purchased an investment property and negotiated a lower price based on repairs that needed to be performed.

The Jhas are real estate investors. Dkt. No. 30 at 17-18. In May 2013, they began negotiating the purchase of a property in Woodinville, Washington (the "Property"). *Id.* at 23, 26. The Property consisted of two acres and an 8,400 square foot residence still under construction. Dkt. No. 27 at 1 ¶ 3. At the time, PNC Bank owned the Property, which it had acquired after foreclosing on the previous owner. *Id.*

On May 17, 2013, Sidd Jha—the Jha's son—emailed the Bank's real estate agent, disclosing his family's "strong interest" in the property and acknowledging, among other things, that he knew the Property "currently has a drainage problem that King County is in the process of reviewing." Dkt. No. 30 at 63. Over the next few months, the Jhas tried to buy the Property, with an opening offer of $1.3 million and increasing to $1.575 million, but the Bank rejected their offers in favor of a higher bid. Dkt. Nos. 30 at 26, 35; 29 at 7.

The Bank's other buyer fell through, so its real estate agent reached out to the Jhas in September 2013 to gauge their interest in buying the Property. Dkt. No. 29 at 6-7. In an email to the Jhas' real estate agent dated September 17, 2013, which he forwarded to the Jhas, the Bank's agent disclosed that there was a "storm water

ORDER - 2

drainage issue," that King County had "inspected the system and found [a] list of deficiencies," which he attached to his email, and that the County had rejected less expensive ways to cure the problems. *Id*. The agent confided that the "bank's concern is that the County has pulled back their approval after granting it" and that "they don't know yet exactly what work is needed yet." *Id*. (emphasis in original). Finally, the Bank's real estate agent forwarded the Jha's several documents, including two construction estimates ranging from $109,789.17 to $136,895 for repairs to the stormwater system. *Id*. at 23, 119. The estimates described the scope of the repairs to be performed. *Id*.

The Bank's real estate agent sent the Jhas another email days later, this time with the contact information for King County's permitting engineer, stating "[h]ere is the woman who is requiring the asphalt pipes as the last condition for the storm water issue," and forwarding the Temporary Certificate of Occupancy showing the "T.C.O. approved subject to completion of site inspection items. Building inspection items are completed." Dkt. No. 29 at 126, 128.

The Jhas and the Bank kept negotiating over the next few months. On March 3, 2014, the Jhas decreased their last, best offer from $1.575 to $1.4 million to buy the Property in "as-is" condition. Dkt. Nos. 30 at 38; 27 at 5. As part of the information exchange between the Jhas and the Bank, the Bank forwarded the Jhas more engineering reports and construction bids, including an updated quote for repairs to the "storm water system" for $171,737.50. Dkt. No. 29 at 130, 221.

The Jhas pursued and obtained their own bids to make repairs to the Property, including the stormwater drainage system. Dkt. No. 30 at 51-52. They used the

ORDER - 3

knowledge they gathered to support an even lower purchase price on the Property of $1,250,000. Dkt. No. 27 at 5 ¶ 24. Along with their revised offer to the Bank, the Jhas sent the Bank a detailed memo justifying their reduced offer. Dkt. No. 27 at 91. In the memo, dated March 24, 2014, the Jhas admitted, "We understand the property doesn't have a King County approved storm water drainage system, which the Buyer has taken full responsibility for," and that "the house is being sold as-is and . . . does not have an occupancy permit." Dkt. No. 27 at 91. The Jhas also acknowledged the "King County list" of items required to "fix the drainage system," as well as the estimates the Bank obtained to fix the problems and the Jhas own estimates to fix "additional substantial, material damages" ranging from $211,660.62 to $400,000. *Id.* The memo closed with the following: "In summary, we agreed to close at a time convenient for you and all we are asking is that you agree to a minor reduction in the price to reflect the substantial increase in the cost that we have to bear for actual damages –a very reasonable request." *Id.*

The Jhas eventually bought the Property from the Bank for $1,325,000. Dkt. No. 27 at 7, 95. The Jhas closed on the Property in April 2014. Dkt. No. 30 at 24.

Over the next two years, the Jhas spent $242,848.20 repairing the Property's drainage system. Dkt. No. 23 at 4-5 ¶¶ 13-16.

**2.2  The Jhas bought title insurance from Chicago Title. They filed many claims against their policy, which Chicago Title denied.**

In April 2014, the Jhas purchased a Title Policy (the "Policy") from Chicago Title after they bought the Property. Dkt. Nos. 23 at 2 ¶ 6; 23-3 at 11-26. The Policy protected the Jhas against loss resulting from 32 enumerated risks, but it included

several exceptions found on Schedule B and a number of policy exclusions. Dkt. No. 23-3 at 11-26.

On March 22, 2021, the Jhas filed a claim with Chicago Title alleging 12 title "defects," or documents, affecting title to their Property. Dkt. No. 23-3 at 2-9. On August 23, 2021, after investigating the matter for five months, Chicago Title declined coverage on 11 of the Jhas' claims. Dkt. No. 23-11. Five documents are now at issue:

- 2000 Declaration of Easement (Document No. 20000616001981) ("2000 Easement")
- 2001 Declaration of Covenant (Document No. 20010816001654) ("2001 Covenant")
- 2004 Declaration of Covenant (Document No. 20040727002470) ("2004 Covenant")
- 2010 Notice of Code Violation (Document No. 20100325000117) ("2010 Violation Notice")
- 2011 Termination of Enforcement Notice (Document No. 20110411000079) ("2011 Termination Notice").

Dkt. No. 23-3 at 2-9, 53-65, 67-70, 82-85, 94-95, 97.

The 2000 Easement is the lone claim that Chicago Title did not decline out right; Chicago Title responded that it would retain a surveyor to complete a desk survey and get back to the Jhas with a coverage determination. Dkt. 23-11 at 4.

On October 31, 2021, five months after Chicago Title's initial rejection, the Jhas sent Chicago Title a letter demanding, among other things, that it reconsider

ORDER - 5

its earlier coverage decisions and to request the status of the Jhas' claim related to the 2000 Easement. Dkt. No. 23-12.

In March 2022, the Jhas filed this lawsuit in state court. Dkt. No. 6 at 3. While in state court, the Jhas moved for summary judgment. The state court denied the Jhas' motion for summary judgment and Chicago Title's cross-motion for summary judgment. Since then, the Jhas have conducted a 30(b)(6) deposition of Chicago Title.

### 3.   DISCUSSION

### 3.1   Legal standard.

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (internal citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "'in the light most favorable to the non-moving party.'" *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (internal citation omitted). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Summary judgment should also be granted

where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**3.2    The parties' motions to strike various declarations are denied.**

Both parties move to strike in whole or in part certain declarations filed in support of their summary judgment motions. Not surprisingly, they don't like what the declarants have to say.

Rule 56(c)(4) provides that when affidavits are used to support or oppose a summary-judgment motion, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." On a motion for summary judgment, "a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." *Lee v. Nat'l Life Assur. Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980).

Chicago Title moves to strike the declaration of Joe Scuderi almost in its entirety because it contains "arguments rather than simply authenticating the

ORDER - 7

deposition transcripts."[1] Scuderi's declaration mostly recounts Chicago Title's Rule 30(b)(6) testimony, punctuated by Scuderi's editorial statements to contextualize the testimony, which are presented as unsupported statements of fact. The Court disregards these statements in favor of the Rule 30(b)(6) deposition transcripts excerpts, to which Chicago Title does not object, but the Court declines to strike the Scuderi declaration.

Chicago Title also objects to portions of Lakhan Jha's declaration and Danette Leonhardi's declaration in whole. The Court disregards any irrelevant statements contained within Jha's declaration, *see* Fed. R. Evid. 401, but declines to strike those offending portions of his declaration. Similarly, given that the Court has not imposed an expert disclosure deadline, it declines to strike Leonhardi's declaration as a discovery sanction, as suggested by Chicago Title.

Finally, the Jhas move to strike Lara Dunn's declaration, claiming that it contradicts her earlier statements. But a declaration need not be stricken just because it conflicts with the declarant's prior sworn statements. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001).

---

[1] Chicago Title also argues the Jhas attempt to circumvent the word limit for summary judgment motions through Scuderi's declaration and that it should therefore be stricken. The irony of this argument is not lost on the Court given the two partial summary judgment motions Chicago Title previously filed in contravention of the Local Rules, and the Court's order striking the motions and directing Chicago Title to refile them as a single motion. *See* Dkt. No. 58. Chicago Title appears to have merely refiled one of the same motions the Court struck. It remains to be seen whether Chicago Title will file another dispositive motion—nothing in the Local Rules prevents *successive* dispositive motions—but filing such motions back-to-back under these circumstances strays from the purpose of the rules to "promote the just, efficient, speedy, and economical determination" of the proceedings. LCR 1(a).

### 3.3 The 2001 and 2004 Covenants and 2010 and 2011 Notices constitute Covered Risks under the policy.

Chicago Title argues generally that the 2001 and 2004 Covenants and the 2010 and 2011 Notices are not covered under the Policy, but it mounts a specific challenge about only the 2010 and 2011 Notices and whether they fall within Covered Risk 14. Dkt. No. 59. The Jhas do not address Chicago Title's arguments construing Covered Risk 14, but argue that Chicago Title's Rule 30(b)(6) designee admitted that the Covenants and Notices fall under the Policy's Covered Risks. Dkt. No. 60 at 9-10.

"[T]he testimony of a Rule 30(b)(6) deponent does not absolutely bind the corporation in the sense of a judicial admission…." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1104 (9th Cir. 2018) (quoting and citing 7 James Wm. Moore et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)). But "[a] corporation *generally* cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative." *Id.* at 1103 (emphasis in original) (citing 7 James Wm. Moore et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)). Thus, such testimony is "evidence that, like any other deposition testimony, can be contradicted and used for impeachment purposes." *Id.*

Chicago Title does not address, much less explain, why the testimony of its Rule 30(b)(6) designee should be disregarded. *See* Dkt. Nos. 21-1 at 11-19, 31-32; *see also id.* at 20-22, 26-27, 32-33. Nor does it offer evidence to clarify or offer context for its 30(b)(6) testimony. Moreover, Chicago Title conceded during the hearing on its motion that its primary argument was that policy exemptions or exclusions

ORDER - 9

precluded coverage, not that the title defects fell outside the definition of all Covered Risks. As such, the Court finds that the 2001 and 2004 Covenants and the 2010 and 2011 Notices fell within Covered Risks 1, 2, 4, 5, and 9.[2] *See Bordeaux, Inc. v. Am. Safety Ins. Co.,* 186 P.3d 1188, 1191 (2008) ("The courts liberally construe insurance policies to provide coverage wherever possible.").

As discussed further below, however, the question is whether any policy exclusions preclude coverage nevertheless.

### 3.4  Policy exclusions apply to the Jhas' title insurance claims.

Chicago Title contends even if the 2001 and 2004 Covenants, and the 2010 Violation and 2011 Termination Notices, fall under a Covered Risk, several policy exclusions apply. The Jhas argue that Chicago Title is wrong about the law and the operation of the exclusions.

Title insurance policies are construed just like any other contract. *Santos v. Sinclair*, 884 P.2d 941, 943 (Wash. Ct. App. 1994). But coverage "[e]xclusions should also be strictly construed against the insurer." *Stuart v. Am. States Ins. Co.*, 953 P.2d 462, 464 (Wash. 1998). This is because "exclusions from coverage of insurance are contrary to the fundamental protective purpose of insurance," so the Washington Supreme Court has held they should "not be extended beyond their clear and unequivocal meaning." *Id.* Insurers bear the burden of showing that a

---

[2] The testimony of Chicago Title's 30(b)(6) designee was ambiguous concerning whether the 2010 and 2011 Termination Notices fell under Covered Risk 14, so the Court makes no determination whether the Jhas claims fall under this covered risk.

ORDER - 10

coverage exclusion applies. *Mut. of Enumclaw Ins. Co. v. T & G Const., Inc.*, 199 P.3d 376, 383 (Wash. 2008).

### 3.4.1   The 2010 Violation and 2011 Termination Notices are excluded from coverage under the Policy.

The Jhas tendered claims under the Policy for the 2010 and 2011 Notices. Before analyzing the issue, some background about the Notices is necessary. King County issued the 2010 Violation Notice for the "[u]se and occupancy of [the Property] without final inspections and approvals[.]" Dkt. No. 23-3 at 94. King County issued the 2011 Termination Notice, stating the County had "terminated its enforcement action" under the case number referenced in the previous notice, but that it would precede with enforcement against the Property for the violation under a different case number. Dkt. No. 23-3 at 97. Whether the Property's drainage system was adequate was at the heart of the Notices. The Jhas claim they spent $242,848.20 fixing issues with the Property in response to the Notices.

Chicago Title argues that even if the 2010 and 2011 Notices are Covered Risks, Policy Exclusion 4(a) applies because they "were fully aware of the stormwater repair requirements long before they purchased the Property…." Dkt. No. 59 at 20. In relevant part, Exclusion 4(a) states as follows: "You are not insured against loss, costs, attorneys' fees, and expenses resulting from … Risks … that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records …." Dkt. No. 23-3 at 22.

Many title insurance policies carry "allowed or agreed to" exclusions or similar language. *See Tumwater State Bank v. Commonwealth Land Title Ins. Co. of*

ORDER - 11

*Philadelphia*, 752 P.2d 930, 932 (1988). One commentator described the exclusion as "excluding matters that are the insured's 'own darn fault.'" 1 Joyce Palomar, Title Insurance Law § 6.10 (2022 ed.). The leading Washington case on the exclusion is *Tumwater,* which both parties cite.

In *Tumwater,* a title insurer argued that its insured—a mortgage lender—"assumed or agreed to" preexisting encumbrances within the meaning of the policy exclusion because it was aware of prior-existing liens on the property at the time it made the loan. 752 P.2d at 931-32. The court held that the insurer failed to establish that the exclusion applied and that, where there was no indication the mortgage lender had agreed that its mortgage would occupy a secondary position to preexisting liens, "something more than knowledge on the part of the insured is necessary to bar coverage." *Id.* at 933.

The Jhas argue this case is like *Tumwater* and that the 4(a) exclusion does not apply because, at best, Chicago Title can only prove the Jhas had knowledge about the Property's storm drain issues. But the Court finds otherwise—the Jhas are undone by the contemporaneous records they created during their purchase negotiations, which show they had "something more than knowledge" about the drainage problems and still *agreed* to buy the Property.

To start, the Jhas knew the Property was experiencing significant storm drain issues before purchase, as shown in their written correspondence with the Bank. Indeed, in their earliest email showing interest in the Property, the Jhas acknowledged that the Property had an active drainage problem. Next, not only were they aware the Property had a drainage problem, but the Jhas knew it was a

matter of County code compliance. The Bank forwarded the Jhas a list of deficiencies the County had found with the Property, and on the eve of purchase, the Jhas repeated their understanding that the "property doesn't have a King County approved storm water drainage system" and that it lacked an occupancy permit as a result. The Jhas pursued the Property in "as-is" condition and knew that bringing the draining system into code compliance would be costly. The construction estimates they received from the Bank and confirmed by their contractors confirmed that fixing the problem was a six-figure endeavor.

On this record, the Court finds the Jhas accepted the risk of buying an out-of-code property in need of expensive repairs in return for purchasing the Property at a steeply discounted price—the "something more" contemplated in *Tumwater* to trigger the 4(a) policy exclusion precluding claims for the expenses the Jhas would eventually incur.

The Jhas argue intentional misconduct or some other inequitable dealing by the insured is required for the exclusion to apply. *See* Dkt. No. 60 at 12. But no one has suggested the Jhas created or caused the drainage problem, so those cases relied upon by the Jhas holding the exclusion applies to defects caused by the insured's own "deliberate, dishonest, illegal, or inequitable dealings" do not fit. *Chicago Title Ins. Co. v. Resol. Tr. Corp.*, 53 F.3d 899, 907 (8th Cir. 1995) (internal quotations omitted).

Rather, the focus here is on the risks the Jhas "agreed to." The Maryland Court of Appeals decision in *Malkin v. Realty Title Ins. Co.*, 223 A.2d 155 (1966), illustrates this point. There, the court affirmed dismissal of the insured's title

claims for an encroaching roadway. The court held that the insured assumed or agreed to exclusion applied because the insured were not "in the role of simple, 'unsophisticated' people" . . . and they understood the road occupied part of the land, that it made no difference to them when they inspected the property since they knew what they were getting, and that they chose to complete the purchase transaction with this knowledge. *Id.* at 156-58.

In sum, the Jhas were sophisticated real estate investors looking for below-market investment opportunities. They knew the risks presented by the Property's storm drainage and other issues and still pursued it before closing on the Property. Thus, they "agreed to" the risk of loss, costs, and expenses resulting from the Property's drainage system and the 2010 and 2011 Notices regarding the same.

### 3.4.2   Chicago Title is not estopped from raising Exclusion 4(a).

The Jhas argue that because Chicago Title offered one explanation for denying their claims for the 2010 and 2011 Notices before litigation began, the "mend the hold" doctrine precludes them from offering a different explanation now. "The 'mend the hold' doctrine 'forbids a contract party, particularly when it is an insurance company, to change its position on the meaning of the contract in the middle of litigation over it.'" *Dentists Ins. Co. v. Yousefian*, No. C20-1076-RSL, 2023 WL 4106220, at *12 (W.D. Wash. June 21, 2023) (quoting *Utica Mut. Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 716 (7th Cir. 2004)). "'Although Washington has never recognized the 'mend the hold' doctrine . . . [Washington's] doctrines of waiver and estoppel are functionally similar.'" *Id.* (quoting *McAlpine v. State Farm Fire & Cas.*

*Ins. Co.*, 540 Fed. App'x 559, 560 (9th Cir. 2013)). In Washington, it is the "general rule that if an insurer denies liability under the policy for one reason, while having knowledge of other grounds for denying liability, it is estopped from later raising the other grounds in attempt to escape liability." *Bosko v. Pitts & Still*, 454 P.2d 229, 234 (Wash. 1969).

Here, the Jhas hid the extent of their pre-purchase knowledge about the Property's drainage issues from Chicago Title when they first submitted their coverage claims. In response to Chicago Title's request for relevant documents, they failed to produce their March 2014 memo to the Bank, the Bank's pre-purchase disclosures, including the County's punch list, engineering reports, and construction bids, or the independent construction estimates the Jha's obtained. *See* Dkt. No. 23-5 at 2-8. Thus, Chicago Title is not estopped from raising Exclusion 4(a) because it lacked knowledge about the potential grounds to apply the policy exclusion at the time the Jhas made their claim.

### 3.4.3  Policy Exclusions apply to the 2001 and 2004 Covenants.

Chicago Title contends two different policy exclusions apply to the 2001 and 2004 Covenants: Exclusion 1, which excludes losses resulting from the exercise of any government regulation, and Exclusion 4(c), which excludes claims that result in "no loss to [the insured]." Dkt. No. 23-3 at 22. Chicago Title argues the exclusions work together to preclude coverage because the Jhas "did not suffer any loss *from* the recorded Covenants because Plaintiffs would have been required by King

County to record them anyway." Dkt. No. 64 at 12-13 (emphasis in original). The Jhas contend Chicago Title is wrong about the operation of both exclusions.

Deciding this question requires closer examination of the Policy itself. The Policy is one of indemnity against "*actual loss*, including any costs, attorneys' fees and expenses" resulting from a defined Covered Risk. Dkt. No. 23-3 at 14 (emphasis added); *see Sec. Serv., Inc. v. Transamerica Title Ins. Co.*, 583 P.2d 1217, 1221 (1978) ("The [title insurance] contract is one of indemnity against defects in or unmarketability of title, or liens, or encumbrances."). Exclusion 4(c) of the Policy reiterates that risks "that result in no loss to [the insureds]" are excluded from coverage. Dkt. No. 23-3 at 22.

In *Miebach v. Safeco Title Ins. Co.*, 743 P.2d 845, 846 (Wash. Ct. App. 1987), the Washington Court of Appeals analyzed the phrase "actual loss," and held that it was ambiguous and must be broadly construed in favor of the insured to mean more than just "out of pocket" losses. Looking beyond Washington, courts in other jurisdictions have held that uncertainty about the status of title can cost an insured owner the freedom to develop, sell, or mortgage property and thus constitute a loss. *BJD Prop., LLC v. Stewart Title Guar. Co.*, 380 F. Supp. 3d 560, 575 (W.D. La. 2019) ("[T]he insured-friendly construction is that an insured experiences an 'actual loss' if a defect or encumbrance would make the property of less value to a potential purchaser of the property."). Similarly, other courts have found that an insured owner sustains a loss from the mere existence of an encumbrance since any "resale value will always reflect the cost of removing the lien." *Twin Cities Metro-Certified*

*Dev. Co. v. Stewart Title Guar. Co.*, 868 N.W.2d 713, 717 (Minn. Ct. App. 2015) (cleaned up).

Whether the Court defines "actual loss" as out-of-pocket losses suffered, the loss in potential resale value, or the freedom to develop the land, Chicago Title has shown that the Jhas have suffered no losses at all because of the 2001 and 2004 Covenants. This is because the recorded Covenants are a required feature of the King County Surface Water Management Code, which states that "[p]rior to the issuance of any of the permits for any multifamily or commercial project required to have a flow control or water quality treatment facility, the applicant *shall record a declaration of covenant* as specified in the Surface Water Design Manual." *See* K.C.C. 9.04.120.B (emphasis added). The declaration of covenant in the Surface Water Design Manual grants the County a right to ingress and egress to inspect the drain field. *See* 2021 King County Surface Water Design Manual, Reference 8-J Declaration of Covenant (available at https://your.kingcounty.gov/dnrp/library/water-and-land/stormwater/surface-water-design-manual/2021/2021-kcswdm-full-manual.pdf).[3] The Jhas do not argue, nor does the Court find, that the Property is *not* subject to the Surface Water Management Code.

---

[3] Although the King County Surface Water Design Manual is not part of the record, both parties cite the King County Surface Water Management Code, which contains many references to the Design Manual. Accordingly, the Court takes judicial notice of the Design Manual under Rule 201 as a public record. *See U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014) ("Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies.") (internal quotations omitted).

ORDER - 17

The Jhas do not argue or put forth any evidence that they have suffered any pecuniary loss because of the Covenants. Nor do they argue or put forth any evidence establishing that the Covenants have diminished the resale value of the property. Thus, in the absence of any genuine dispute about whether the 2001 and 2004 Covenants have resulted in any losses—they have not—the Court finds Exclusion 4(c) precludes coverage of the Jhas claims for the Covenants.

### 3.5 The Jhas are not entitled to judgment on their breach of contract claim.

The Jha contend they are entitled to judgment on their breach of contract claim, arguing Chicago Title failed to honor its contractual obligation to cover the 2010 and 2011 Notices as well as the 2001 and 2004 Covenants. But as explained above, coverage of these claims is excluded under various Policy exclusions. *See supra* Section 3.4.3. Accordingly, the Court DENIES Plaintiffs' Motion for Summary Judgement on their Breach of Contract Claim.

### 3.6 The Jhas are not entitled to judgment on their bad faith and IFCA claims.

The Jhas seek judgment on their bad faith and IFCA claims, arguing Chicago Title's handling of their title defect claims was unreasonable. "The duty of good faith . . . permeates the insurance agreement." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 667-668 (Wash. 2008). "[A]n insurer has a duty of good faith to its policyholder and violation of that duty may give rise to a tort action for bad faith." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1276-77 (Wash. 2003) (internal citations omitted). Because the duty of good faith sounds in tort, a plaintiff may

maintain an action for bad-faith investigation of their insurance claim "regardless of whether the insurer was ultimately correct in determining coverage did not exist." *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 937 (1998) ("An insurer's duty of good faith is separate from its duty to indemnify if coverage exists."). Whether an insurer acted in bad faith is usually a question of fact. *St. Paul Fire & Marine Ins. Co.*, 196 P.3d at 668. "The determinative question is reasonableness of the insurer's actions in light of all the facts and circumstances of the case." *Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000).

Similarly, IFCA provides that any "first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action ... to recover the actual damages sustained." RCW 48.30.015(1).

The Jhas bad faith and IFCA claims encompass the same allegedly unreasonable conduct: Chicago Title's handling of the Jha's title defect claims for the coverage denial of the 2001 and 2004 Covenants and 2010 and 2011 Notices, as well as the "extraordinary[ly]" long delay in reaching coverage decision on the 2000 Easement. The Court finds that there are genuine disputes of material fact about the reasonableness of Chicago Title's handling of the Jha's title defect claims that preclude summary judgment. At oral argument on their motion, counsel for the Jhas agreed. Likewise, the Court cannot conclude as a matter of law that Chicago Title violated any of the insurance claims handling provisions within the Washington Administrative Code, as the Jhas contend. Accordingly, the Court

DENIES the Jhas' motion for summary judgment on their bad faith and IFCA claims.

**3.7  Prejudgment interest.**

Lastly, the Court DENIES the Jhas' motion for prejudgment interest because they have not established that they are entitled to damages.

## 4.  CONCLUSION

In sum, the Court GRANTS Chicago Title's Motion for Partial Summary Judgment. Dkt. No. 59. The 2010 and 2011 Notices and 2001 and 2004 Covenants are excluded from coverage under the Policy. The Court DENIES the Jhas' Motion for Partial Summary Judgment. Dkt. No. 20.

Dated this 8th day of November, 2023.

Jamal N. Whitehead
United States District Judge